## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOOGLE LLC,<br><br>    *Plaintiff,*<br><br>  v.<br><br>DOE 1 a/k/a YUCHENG CHANG and DOES 2–25,<br><br>    *Defendants.* | Civil Action No.: |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER <u>AND ORDER TO SHOW CAUSE</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 3

ARGUMENT .................................................................................................................... 9

I.      This Court Should Grant Google's Proposed Temporary Restraining Order and
        Order to Show Cause for a Preliminary Injunction. ......................................... 9

        A. Google and the Public Will Suffer Irreparable Harm Absent Relief. ........................ 10

        B. Google Is Likely to Succeed on the Merits. .................................................. 11

        C. The Balance of Equities Decidedly Favors a Temporary Restraining Order. ............... 20

        D. The Public Interest Favors a Temporary Restraining Order. ....................................... 21

II.     The Temporary Restraining Order Must Be *Ex Parte*. ...................................... 21

III.    The Court Should Authorize Google to Serve Process by Alternative Means. .................24

IV.     The All Writs Act Authorizes the Court to Direct Cooperation by Third Parties. ........... 25

CONCLUSION ...................................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*1567 56th St., LLC v. Spitzer,*
    774 F. Supp. 3d 476 (E.D.N.Y. 2025) ...................................................................................15

*3M Co. v. CovCare, Inc.,*
    537 F. Supp. 3d 385 (E.D.N.Y. 2021) ...................................................................................20

*Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia, S.P.A.,*
    847 F.2d 53 (2d Cir. 1988)...................................................................................................12

*Apotex Inc. v. Acorda Therapeutics, Inc.,*
    823 F.3d 51 (2d Cir. 2016)...................................................................................................13

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.),*
    770 F.2d 328 (2d Cir. 1985)...................................................................................................25

*Bascunan v. Elsaca,*
    927 F.3d 108 (2d Cir. 2019)...................................................................................................17

*Chegg, Inc. v. Doe,*
    2023 WL 7392290 (N.D. Cal. Nov. 7, 2023) .......................................................................26

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH,*
    843 F.3d 48 (2d Cir. 2016)...................................................................................................13

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,*
    794 F.2d 38 (2d Cir. 1986)...................................................................................................10

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
    598 F.3d 30 (2d Cir. 2010)...............................................................................................9, 11

*CME Grp. Inc. v. Nagovskiy,*
    2019 WL 13252902 (N.D. Ill. Mar. 7, 2019).........................................................2, 9, 12, 21

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861,*
    96 F.4th 351 (2d Cir. 2024) ...................................................................................................2

*DeFalco v. Bernas,*
    244 F.3d 286 (2d Cir. 2001)...........................................................................14, 15, 16, 17

*Drobbin v. Nicolet Instrument Corp.,*
    631 F. Supp. 860 (S.D.N.Y. 1986) .......................................................................................10

*Elsevier, Inc. v. Siew Yee Chew,*
    287 F. Supp. 3d 374 (S.D.N.Y. 2018)...................................................................................24

*Facebook, Inc. v. Fisher*,
2009 WL 5095269 (N.D. Cal. Dec. 21, 2009) ..........................................................9

*Filipova v. Gezhong (7–21 Delivery)*,
2025 WL 2831148 (S.D.N.Y. Oct. 6, 2025) ............................................................22

*FTC v. Automators LLC*,
2023 U.S. Dist. LEXIS 150791 (S.D. Cal. Aug. 25, 2023) ....................................23

*FTC v. Verity Int'l, Ltd.*,
2000 WL 1805688 (S.D.N.Y. Dec. 8, 2000) ..........................................................20

*Google LLC v. Does 1–25*,
No. 1:25-cv-04503, (S.D.N.Y. July 1, 2025), ECF No. 17......................................23

*Google LLC v. Does 1–25*,
No. 1:25-cv-04503, (S.D.N.Y. July 1, 2025), ECF No. 18.................................2, 26

*Google LLC v. Does 1–25*,
No. 1:25-cv-09421, (S.D.N.Y. Nov. 12, 2025), ECF No. 18 ......................... *passim*

*Google LLC v. Does 1–25*,
No. 1:25-cv-09421, (S.D.N.Y. Dec. 1, 2025), ECF No. 27 .....................................19

*Google LLC v. Starovikov*,
2021 WL 6754263 (S.D.N.Y. Dec. 16, 2021) .....................................................2, 26

*Google LLC v. Starovikov, et al.*,
No. 1:21-cv-10260 (S.D.N.Y. Dec. 27, 2021), ECF No. 8.................................22, 23

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
415 U.S. 423 (1974)........................................................................................22, 23

*Hinterberger v. Catholic Health Sys., Inc.*,
536 F. App'x 14 (2d Cir. 2013) .............................................................................14

*Juicero, Inc. v. Itaste Co.*,
2017 WL 3996196 (N.D. Cal. June 5, 2017) .........................................................24

*Makekau v. Hawaii*,
943 F.3d 1200 (9th Cir. 2019) ...............................................................................25

*Marvici v. Roche Facilities Maint. LLC*,
2021 WL 5323748 (S.D.N.Y. Oct. 6, 2021) ..........................................................24

*Med. Marijuana, Inc. v. Horn*,
604 U.S. 593 (2025)...............................................................................................18

*Microsoft Corp. v. Does 1–18*,
  2014 WL 1338677 (E.D. Va. April 2, 2014) ...........................................24

*Microsoft Corp. v. Does 1–2*,
  2022 WL 18359421 (E.D. Va. Dec. 27, 2022) ...........................2, 9, 21

*Microsoft Corp. v. Does 1–2*,
  2024 WL 1708328 (E.D. Va. Jan. 10, 2024) ...............................20, 21

*Microsoft Corp. v. Does 1–2*,
  No. 17-cv-01224 (E.D. Va. Oct. 27, 2017), ECF No. 26 ...................27

*Microsoft Corp. v. John Does 1–2*,
  No. 21-cv-00822 (E.D. Va. July 16, 2021), ECF No. 18 ..................27

*Microsoft Corp. v. John Does 1–2*,
  No. 24-cv-02719 (D.D.C. Sept. 25, 2024), ECF No. 12 ...................27

*Microsoft Corp. v. Nady and Does 1–4*,
  No. 24-cv-02013 (E.D. Va. Nov. 13, 2024), ECF No. 16 ..................26

*Mirashi v. Doe*,
  2025 WL 783353 (D.N.J. Mar. 12, 2025) ........................................22

*Playtex Prods., LLC v. Munchkin, Inc.*,
  2016 WL 1276450 (S.D.N.Y. Mar. 29, 2016) ................................13

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ..........................................................10

*Rio Props., Inc. v. Rio Int'l Interlink*,
  284 F.3d 1007 (9th Cir. 2002) ......................................................24

*Safe Streets All. v. Hickenlooper*,
  859 F.3d 865 (10th Cir. 2017) ......................................................16

*Sapient Corp. v. Does 1–50*,
  2018 WL 8221301 (N.D. Cal. Mar. 27, 2018) ..........................22, 24

*Sapient Corp. v. Okorie*,
  2019 WL 1983230 (N.D. Cal. Mar. 26, 2019) ..............................12

*Saunders Ventures, Inc. v. Salem*,
  797 F. App'x 568 (2d Cir. 2019) ....................................................20

*Schering Corp. v. Pfizer Inc.*,
  189 F.3d 218 (2d Cir. 1999) ..........................................................13

*Sophos Ltd. v. Does 1–2,*
   2020 WL 4722425 (E.D. Va. May 1, 2020) ...........................................................22

*Sprint Spectrum L.P. v. Mills,*
   283 F.3d 404 (2d Cir. 2002)...............................................................................25

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.,*
   120 F.4th 59 (2d Cir. 2024) ...............................................................................14

*Strougo v. Barclays PLC,*
   194 F. Supp. 3d 230 (S.D.N.Y. 2016)....................................................................9

*Suber v. VVP Servs.,*
   2021 WL 1101235 (S.D.N.Y. Mar. 23, 2021) .......................................................20

*Time Warner Cable, Inc. v. DirectTV, Inc.,*
   497 F.3d 144, 153 (2d Cir. 2007)13.....................................................................13

*Tracfone Wireless, Inc. v. Simply Wireless, Inc.,*
   229 F. Supp. 3d 1284 (S.D. Fla. 2017) ................................................................19

*Two Hands IP LLC v. Two Hands Am., Inc.,*
   563 F. Supp. 3d 290 (S.D.N.Y. 2021)..................................................................10

*In re U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire*
   *Commc'ns Over Tel. Facilities,*
   616 F.2d 1122 (9th Cir. 1980) ............................................................................26

*United Spinal Ass'n v. Bd. of Elections in City of N.Y.,*
   2017 WL 8683672 (S.D.N.Y. Oct. 11, 2017)........................................................26

*United States v. Aulicino,*
   44 F.3d 1102 (2d Cir. 1995)................................................................................16

*United States v. Errico,*
   635 F.2d 152 (2d Cir. 1980)...............................................................................16

*United States v. N.Y. Tel. Co.,*
   434 U.S. 159 (1977)......................................................................................25, 26

*United States v. Turkette,*
   452 U.S. 576 (1981)...........................................................................................15

*United States v. Valle,*
   807 F.3d 508 (2d Cir. 2015)...............................................................................19

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.,*
   725 F. Supp. 2d 378 (S.D.N.Y. 2010)..................................................................20

*Victorinox AG v. B&F Sys., Inc.*,
   114 F. Supp. 3d 132 (S.D.N.Y. 2015)....................................................................12

*Virgin Enters. Ltd. v. Nawab*,
   335 F.3d 141 (2d Cir. 2003)..............................................................................11

*In re Vuitton et Fils S.A.*,
   606 F.2d 1 (2d Cir. 1979) (per curiam).............................................................22

*Weaver v. Schiavo*,
   750 F. App'x 59 (2d Cir. 2019) ............................................................................9

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012)..............................................................................20

*Yahoo! Inc. v. XYZ Cos.*,
   872 F. Supp. 2d 300 (S.D.N.Y. 2011)...............................................................12

**Statutes**

15 U.S.C. § 1114..............................................................................................11, 12

15 U.S.C. § 1116....................................................................................................10

15 U.S.C. § 1125..............................................................................................12, 13

18 U.S.C. § 1029....................................................................................................19

18 U.S.C. § 1030..............................................................................................19, 20

18 U.S.C. § 1343....................................................................................................17

18 U.S.C. § 1961..............................................................................................16, 17

18 U.S.C. § 1962..............................................................................................18, 19

18 U.S.C. § 1964....................................................................................................18

28 U.S.C. 1651.......................................................................................................25

**Rules**

Fed R. Civ. P. 4(f)(3) ...........................................................................................24

Fed. R. Civ. P. 65 ..................................................................................................21

Fed. R. Civ. P. 65(b)(l) .........................................................................................21

Fed. R. Civ. P. 65(b)(2)..........................................................................................23

# INTRODUCTION

This is an application for an emergency *ex parte* temporary restraining order ("TRO") to disrupt a global criminal enterprise that has stolen personal and financial information from over a million victims already and exploited the trust and goodwill associated with the Google brand. Using novel software designed to facilitate large-scale "phishing" attacks with artificial intelligence ("AI") technology,[1] Defendants lure unsuspecting victims into entering their credit card information and other credentials on fraudulent websites designed to mimic the websites of legitimate organizations such as the United States Postal Service, toll collection agencies, large financial institutions, and even Google and YouTube. The spoofed websites often feature Google logos to further enhance the illusion of legitimacy.

Defendants are members of a criminal enterprise operating under the alias "Darcula" (the "Enterprise" or the "Darcula Enterprise") that built, promoted, and deployed its phishing-as-a-service software known as "Magic Cat." Magic Cat is an end-to-end toolkit designed to facilitate every aspect of a phishing cyberattack. Enterprise members coordinate with each other to identify potential victims, "phish" using deceptive text messages and ads, build fraudulent websites, steal victims' personal and financial information, and monetize that information through various means, including transferring funds from victims' accounts to themselves and selling the stolen information to other criminals for further illicit use.

The Darcula Enterprise has already stolen personal and financial information from millions of victims globally, including in the Southern District of New York. Cybersecurity researchers estimate that 70–80% of all fraudulent text messages from Chinese phishing groups between late-2023 and mid-2024 originated from the Enterprise. Thanks to the work of cybersecurity experts

---

[1] A "phishing" attack is a form of cyberattack that dupes victims into clicking on malicious links, often with false messages about a lost package or unpaid toll.

and journalists who alerted the public to the Darcula scheme, the Enterprise has reduced the scope of its phishing operations. But the threat remains. Google's investigation demonstrates that new Magic Cat-linked phishing websites continue to be created daily. Between September and December 2025, Google received more than 5,000 reports from its users about fraudulent messages they received containing known Darcula phishing domains. And because the Enterprise's infrastructure remains intact and available, it could return to its former scope at any moment.

This Court should grant Google's motion and issue the proposed TRO and order to show cause for a preliminary injunction. Google needs these injunctions to carry out its disruption plan, which will disable domains the Enterprise has used to spoof legitimate websites in its phishing schemes. This Court and others have issued injunctions to disrupt similar cybercriminal enterprises.[2] This requested injunctive relief will disrupt the Enterprise's fraudulent schemes and impede further criminal activity by preventing the Enterprise's ability to reach additional victims.

Google's application establishes the factors necessary to obtain a TRO and a preliminary injunction. *See Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024). Defendants are members of an integrated criminal enterprise who carry out phishing attacks to defraud unsuspecting targets in the United States. To facilitate their criminal schemes, they spoof Google websites, use Google's products (e.g., Google Messages) to deliver their fraudulent messages to Google's customers, and use Google's trademarks and service marks (as further defined herein, Google's "Marks") on their spoofed websites to trick unsuspecting victims into thinking those fake websites are legitimate. The Enterprises' criminal activities

---

[2] *See, e.g.*, *Google LLC v. Does 1–25*, No. 1:25-cv-09421 (S.D.N.Y. Nov. 12, 2025), ECF No. 18; *Google LLC v. Does 1–25*, No. 1:25-cv-04503 (S.D.N.Y. July 1, 2025), ECF No. 18; *Microsoft Corp. v. Does 1–2*, 2022 WL 18359421, at *4 (E.D. Va. Dec. 27, 2022), *R&R adopted*, 2023 WL 289701 (E.D. Va. Jan. 18, 2023); *Google LLC v. Starovikov*, 2021 WL 6754263, at *1 (S.D.N.Y. Dec. 16, 2021); *CME Grp. Inc. v. Nagovskiy*, 2019 WL 13252902, at *2 (N.D. Ill. Mar. 7, 2019).

therefore violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Lanham Act, and the Computer Fraud and Abuse Act ("CFAA") and irreparably harm Google.

To prevent irreparable harm, relief must be *ex parte*. Advance notice could render futile the very relief Google seeks by allowing Defendants the opportunity to relocate their malicious infrastructure and conceal evidence of their misconduct. Google also respectfully submits that there is good cause for the Court to extend the TRO to early January to effectuate the disruption over the holidays, which requires coordination and action with at least 15 registrars. If this Court grants the emergency injunctive relief requested, Google will provide Defendants with notice after executing the disruption (and before a preliminary injunction hearing) through service as requested in this motion.

**BACKGROUND**

Defendants Doe 1 a/k/a Yucheng Chang and Does 2–25 are cybercriminals and co-conspirators who are members of the Enterprise and operate the well-known "Darcula" phishing ring using a set of software tools known as "Magic Cat." Complaint ("Compl.") ¶¶ 14–17; Declaration of ████████████ ("Google Decl.") ¶¶ 15–22; Declaration of ████████ ("Naxo Decl.") ¶¶ 16–21. Defendants are believed to be in China. Compl. ¶¶ 14–15; Google Decl. ¶ 28; Naxo Decl. ¶ 21. Members of the Enterprise license the software and coordinate with each other using dedicated Telegram channels and other electronic communications. Compl. ¶¶ 47–61; Naxo Decl. ¶¶ 18, 20. Some of the Darcula Enterprise's well-known schemes include text phishing scams mimicking messages from the United States Postal Service ("USPS"), state toll collection agencies, and large financial services companies. The Enterprise has also developed a website template designed to facilitate scams impersonating the YouTube Premium enrollment page. Compl. ¶¶ 75–77; Naxo Decl. ¶¶ 58–67. Many of these scams feature Google's trademarks and service marks to convince victims that the websites are legitimate and to turn over their sensitive

3

financial data. Compl. ¶¶ 28, 30, 37–38; Google Decl. ¶¶ 29–37. Google has devoted and continues to devote substantial financial resources to investigating the Darcula schemes, to develop measures to identify and prevent these phishing attacks on its platforms, and to remediate the harms caused by the Enterprise. Compl. ¶¶ 93, 97, 105; Google Decl. ¶¶ 42–43. Since March 2024, the Enterprise has disseminated approximately 90,000 phishing websites. Compl. ¶ 91; Naxo Decl. ¶ 20. Google's investigation shows that the Enterprise continues to create new phishing websites daily, and approximately 400 of these domains remain active. Compl. ¶ 93; Naxo Decl. ¶ 21.

### A. The Magic Cat Software

A "phishing" scheme is a cyberattack that dupes targets into revealing sensitive information (such as login or credit card information) through deceptive emails, text messages, or websites. Compl. ¶ 24; Naxo Decl. ¶ 8. These schemes have been enormously profitable, as has licensing the infrastructure necessary to execute them. Phishing-as-a-Service ("PhaaS") is a business model that sells software and support services to facilitate phishing, making it relatively easy for those without technical expertise to create a phishing campaign. Compl. ¶ 28; Naxo Decl. ¶ 9.

The Magic Cat software is an example of this model. The Enterprise created Magic Cat to make phishing quick, easy, and effective—it is a "phishing for dummies" kit, with a prepackaged suite of all the tools needed to run a phishing campaign, including a platform to collect, organize, and share stolen personal and financial information. The Enterprise has also upgraded the Magic Cat software to enable even more features. Magic Cat V2 included hundreds of premade templates of fake websites spoofing well-known organizations, including Google. Compl. ¶ 33; Naxo Decl. ¶¶ 55–56, 67. The Enterprise introduced Magic Cat V3 earlier this year, which added website customization and generative AI tools that greatly expands the scope of Magic Cat's potential

fraudulent schemes. Compl. ¶ 35; Naxo Decl. ¶ 20. While the Enterprise's phishers were previously limited to a few hundred spoof website templates, the AI functionality now allows Magic Cat users with little technical proficiency to create a spoofed version of any website in minutes. Compl. ¶ 36; Naxo Decl. ¶ 17. With V3, an Enterprise member can simply input the URL for any website into the Magic Cat platform, and the AI will use the website's content to generate a nearly indistinguishable spoofed version of the site that then can be quickly customized for a phishing scheme with Magic Cat's tools. Compl. ¶ 35; Naxo Decl. ¶ 17. On the back-end, the Magic Cat software has keystroke logging capability, which opens a window to a victim's phone or device when a victim accesses one of the fake phishing websites and records that victim's entry of personal and financial account information in real-time. Compl. ¶ 41.

## B. The Darcula Enterprise

The precise identities of the individuals in the Darcula Enterprise are unknown. Compl. ¶¶ 16–17; Google Decl. ¶ 28. But Google, Naxo, and others investigating the Darcula Enterprise have identified at least five interconnected threat groups that manage and participate in the Enterprise. Compl. ¶¶ 47–73; Naxo Decl. ¶ 18. These threat groups develop and use the Magic Cat software to carry out the Enterprise's schemes and depend on each other's specialized contributions to execute the phishing schemes—some of the members may even play multiple roles in the schemes. Compl. ¶ 47; Naxo Decl. ¶ 18. The Developer Group develops and updates the Magic Cat software. Compl. ¶¶ 48–53; Naxo Decl. ¶¶ 6, 20. The Administrative Group connects all the members of the Enterprise together by managing the online communities where members distribute Magic Cat and coordinate support and execution of specific schemes. Compl. ¶¶ 54–61; Naxo Decl. ¶¶ 18, 20. The Data Broker Group supplies mass lists of potential victims' contact information organized by country and location. Compl. ¶¶ 62–64; Naxo Decl. ¶¶ 6, 18, 88–

89. The Spammer Group executes methods of sending out text messages to potential victims en masse (often operating numerous automated cell phone banks) to phish for the victims' personal and financial information. Compl. ¶¶ 65–67; Naxo Decl. ¶¶ 18, 100–04. And finally, the Theft Group monetizes the stolen information and credentials, such as by loading virtual copies of the stolen credit cards into Apple Wallets and Google Wallets, which it then uses to make payments directly to the Enterprise through its tap-to-pay terminals and sells to other criminals on the dark web for further illicit use. Compl. ¶¶ 68–70; Naxo Decl. ¶¶ 102–04. Acting together, the threat actor groups develop and execute the Enterprise's numerous criminal phishing schemes. Compl. ¶¶ 71–72; Naxo Decl. ¶¶ 18, 20, 107.

## C. The Darcula Enterprise's Criminal Schemes

The Enterprise uses Magic Cat to carry out numerous criminal phishing schemes, such as those disseminating fraudulent messages about package deliveries and unpaid tolls to lure potential victims to spoofed websites. Compl. ¶¶ 78–89; Naxo Decl. ¶¶ 22–26.

*Delivery Scheme.* In this scam, the Darcula Enterprise sends a text message—purportedly from the USPS, for example—telling the targets that they have an undelivered package. Compl. ¶ 82; Naxo Decl. ¶ 26. To "complete delivery," the text tells targets that they must pay a small delivery fee by clicking on the website link provided, which directs them to a spoofed USPS website. *Id.* Once on the website, targets are prompted to enter their personal and financial information. Compl. ¶¶ 82–83; Naxo Decl. ¶ 26. As they enter their information, the Magic Cat software simultaneously tracks their keystrokes; the targets need not even submit the payment for the Enterprise to acquire their information. *Id.*

*Toll Scheme.* The Enterprise's Toll Scheme works much the same way; the text indicates that the target has a past due toll violation and directs the target to pay the purported toll. Compl.

¶¶ 87–88; Naxo Decl. ¶ 22. The text directs targets to spoofed websites of state toll collection agencies, such as Florida's SunPass website for toll payments, to enter their personal financial information. Compl. ¶¶ 85–86; Naxo Decl. ¶¶ 22, 44–51. The Darcula websites are nearly indistinguishable from the legitimate websites they mimic. Compl. ¶¶ 30, 35; Naxo Decl. ¶ 6.

*YouTube Scheme.* The YouTube Scheme also includes a text to the victim, but in this iteration, the text lures the target to visit a website mimicking the YouTube Premium enrollment webpage with promises of a free trial. Compl. ¶¶ 75–77; Naxo Decl. ¶¶ 65–66. Once on the fake site, targets are directed to enter their financial information to receive the free trial. Compl. ¶ 76; Naxo Decl. ¶ 66.

### D. The Darcula Enterprise Harms Google and the Public

The Darcula Enterprise harms not only the victims of phishing attacks but also Google, other spoofed organizations, and numerous others. The Darcula Enterprise steals phishing victims' money and personal information. Compl. ¶¶ 90–91; Google Decl. ¶¶ 21–22. The Enterprise also harms Google and other businesses whose logos or websites have been spoofed by damaging customer trust and goodwill. Compl. ¶¶ 101–04; Google Decl. ¶¶ 39–42. Specifically, the Enterprise has created and deployed templates of the YouTube Premium enrollment page and spoofed websites featuring Google's branding or logos (e.g., YouTube, Google Play) on the sign-in screen. Compl. ¶¶ 75–77, 100–02; Google Decl. ¶¶ 32, 34–35. Victims may view the presence of Google logos as an indicator that the website is safe or legitimate. Compl. ¶ 103; Google Decl. ¶ 37. The Darcula Enterprise is thus using the Google branding—and the goodwill associated with it—to convince victims to turn over their sensitive information. *Id.* The Enterprise's crimes have also compelled Google to devote substantial financial resources to investigate the Enterprise's phishing schemes, to develop measures to identify and prevent these phishing attacks on its

platforms, and to remediate the harms caused by the Enterprise. Compl. ¶ 8; Google Decl. ¶¶ 42–43. Despite these efforts, Google has been unable to confirm Defendants' true identities due to their use of aliases and dummy accounts. Compl. ¶ 16; Google Decl. ¶ 28.

The Enterprise's widespread phishing attacks across multiple industries show that it is a sophisticated group with significant reach. Compl. ¶¶ 71–72, 74; Naxo Decl. ¶¶ 18–20. Because Darcula makes phishing so easy, it is capable of causing staggering harm. Compl. ¶ 28; Naxo Decl. ¶ 17. Over the course of just seven months, the Darcula Enterprise stole nearly 900,000 credit card numbers from individuals across more than 200 countries, including individuals in the United States. Compl. ¶ 91; Naxo Decl. ¶ 20. While the Enterprise has reduced its operations and profile following public exposure by journalists and cybersecurity researchers, it continues to create new Magic Cat phishing domains daily. Compl. ¶ 93; Naxo Decl. ¶ 21. Google has identified activity related to Darcula on its own platforms and has taken (and continues to take) action to combat that activity. Compl. ¶¶ 100, 108; Google Decl. ¶¶ 40–43. For example, between September and December 2025, Google received more than 5,000 reports from its users about fraudulent messages they received containing the Darcula Enterprise's phishing domains. Compl. ¶ 124; Google Decl. ¶ 40. And the looming threat of more widescale phishing by the Darcula Enterprise remains. So long as the Enterprise continues to operate and maintain its infrastructure, it continues to inflict and threaten more damage every day. Compl. ¶ 108; Google Decl. ¶ 44. Without further disruption, the Enterprise will continue to conduct its phishing schemes and to generate revenue that it can reinvest in other criminal activities. Compl. ¶ 5; Naxo Decl. ¶ 6.

**ARGUMENT**

## I.    This Court Should Grant Google's Proposed Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction.

A plaintiff is entitled to a TRO and preliminary injunction where (1) it "is likely to suffer irreparable harm in the absence of" relief; (2) it is "likely to succeed on the merits" (or at least raises "sufficiently serious questions"); (3) the "balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–35 (2d Cir. 2010).

Courts balance the factors to grant preliminary relief "like a sliding scale," such that "more of one excuses less of the other." *Strougo v. Barclays PLC*, 194 F. Supp. 3d 230, 233 (S.D.N.Y. 2016) (cleaned up). That said, "[i]rreparable harm is the single most important prerequisite for relief." *Weaver v. Schiavo*, 750 F. App'x 59, 60 (2d Cir. 2019) (cleaned up). Here, each injunction factor weighs in Google's favor. Furthermore, given the grave threat of irreparable harm, this Court may grant Google relief if it concludes that Google's claims raise "serious question[s] going to the merits to make them a fair ground for trial." *Citigroup*, 598 F.3d at 33 (cleaned up).

Courts have granted preliminary relief in cases where, as here, the defendants include unknown persons or entities operating a phishing scheme to harm the plaintiff and the public. *See, e.g.*, *Microsoft Corp.*, 2022 WL 18359421, at *4; *CME Grp. Inc.*, 2019 WL 13252902, at *2; *Facebook, Inc. v. Fisher*, 2009 WL 5095269, at *1 (N.D. Cal. Dec. 21, 2009) (granting TRO where defendants operated a phishing scheme to steal login credentials).

This case is a quintessential candidate for emergency relief. The Enterprise is causing ongoing and irreparable harm to Google and the public. It uses phishing attacks to defraud unsuspecting targets and steal personal and financial information while impairing Google's reputation and goodwill and causing Google (and numerous others) unrecoverable financial losses.

Absent disruption, the Enterprise will continue to profit from its unlawful activities at the expense of Google and an ever-increasing number of victims.

### A. Google and the Public Will Suffer Irreparable Harm Absent Relief.

The Enterprise's illegal activities create consumer confusion in the marketplace, tarnish Google's trademarks, injure its goodwill, and damage its reputation by falsely associating Google with the Enterprise's phishing schemes. Compl. ¶¶ 99–104; Google Decl. ¶¶ 38–40. It is well-established that a company's "loss of reputation, good will, and business opportunities" constitutes irreparable harm. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *accord Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986). Here, Google has invested significant resources to develop strong brand recognition associated with its name, logos, and products. Compl. ¶¶ 11–13; Google Decl. ¶¶ 7, 12. The harm to Google is further compounded by the substantial financial resources Google has devoted and continues to devote to combat the Darcula Enterprise's phishing schemes. Compl. ¶ 99; Google Decl. ¶¶ 42–43.

The irreparable harm to Google is especially clear here given the doubt that it will ever be made whole—even after final judgment—because the Enterprise consists of elusive cybercriminals who likely will take steps to avoid complying with any judgment. *See, e.g.*, *Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 912 (S.D.N.Y. 1986) ("Where a plaintiff's injury is theoretically compensable in money damages but, as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect the plaintiff from irreparable injury."). Moreover, Google is entitled to a presumption of irreparable harm on showing, as Google does here, a likelihood of success on its claims under the Lanham Act. *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021); *see* 15 U.S.C. § 1116(a).

**B.      Google Is Likely to Succeed on the Merits.**

Google need only show that it is "likely to succeed" or that there are sufficiently "serious questions going to the merits to make them a fair ground for litigation." *Citigroup*, 598 F.3d at 34–35 (cleaned up). Google not only raises serious questions going to the merits, but it is likely to succeed on each claim. It has supported its motion with declarations from an investigator in Google's CyberCrime Investigation Group and from Naxo, an investigations and digital forensics firm. Each declaration details substantial evidence of Defendants' misconduct and the irreparable harm they have caused to Google and the public. Given the strength of this evidence, the likelihood of success weighs heavily in favor of granting relief.

**(i)      Google Is Likely to Succeed on its Lanham Act Claims.**

Google has established that Defendants' unauthorized use of Google branding violates the Lanham Act's prohibitions on trademark and service mark infringement, as well as its related prohibitions on false endorsement and sponsorship, false designation of origin, false advertising, and unfair competition.

Section 1114 of the Lanham Act prohibits infringement of a registered trademark or service mark. Infringement occurs when any person, without the consent of the registrant, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services" and "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). A plaintiff need only show that (1) it has a valid, protectable mark and (2) defendants' use of that mark in commerce is likely to cause confusion among consumers. *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). "In trademark cases, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm . . . .  To meet this burden, [the plaintiff] need[s] only to raise a

serious question of likelihood of confusion." *Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia, S.P.A.*, 847 F.2d 53, 55 (2d Cir. 1988) (cleaned up).

Defendants' liability under these provisions is straightforward. Google has valid, protectable rights to the Marks, with relevant, and often incontestable registrations. *See* Google Decl. ¶ 35 (detailing Google's registrations for the relevant Marks). Defendants appropriate those Marks to deceive the public, which is likely to cause confusion and mistake. *See, e.g.*, *CME Grp. Inc.*, 2019 WL 13252902, at *1–2 (finding a "likelihood of confusion" where defendants perpetrated a phishing scheme using plaintiff's marks). Indeed, confusion is the point: Defendants exploit Google's trustworthy and well-known Marks on their spoofed websites to trick their targets into falling for their scams. Such schemes are paradigmatic Lanham Act violations. *See, e.g.*, *id.* (finding Lanham Act liability where defendants used plaintiff's marks "in connection with a phishing scheme designed to solicit or request personally identifiable information, such as user IDs and passwords, from consumers"); *Sapient Corp. v. Okorie*, 2019 WL 1983230, at *2 (N.D. Cal. Mar. 26, 2019) (similar).[3]

Additionally, section 1125(a) prohibits "false designations of origin" that are likely to cause confusion as to the "origin, sponsorship, or approval" of a product or service. 15 U.S.C. § 1125(a)(1)(A). A claim under section 1125(a)(1)(A) has the same elements as a claim under section 1114(1) and can be established with the same evidence, *see Victorinox AG v. B&F Sys., Inc.*, 114 F. Supp. 3d 132, 139 (S.D.N.Y. 2015), so Google's section 1125(a)(1)(A) claim is likely to succeed for the same reasons.

---

[3] *See also, e.g.*, *Yahoo! Inc. v. XYZ Cos.*, 872 F. Supp. 2d 300, 304 (S.D.N.Y. 2011) (upholding trademark infringement claim where defendants intentionally copied plaintiff's name and marks in emails designed to mislead victims into thinking they won lotteries affiliated with plaintiff).

Section 1125(a) also prohibits false advertising. 15 U.S.C. § 1125(a)(1)(B). To qualify as false advertising, a representation must be (1) false, (2) material, (3) placed in interstate commerce, and (4) have caused injury to the plaintiff. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016). False advertising claims thus contain two key components. "First (and obviously), a plaintiff bringing a false advertising claim must show falsity," either by demonstrating a challenged advertisement is false on its face or that the advertisement, "while not literally false, is nevertheless likely to mislead or confuse consumers," *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016) (cleaned up). Second, a plaintiff "must also demonstrate that the false or misleading representation involved an inherent or material quality of the product." *Id.* (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 n.3 (2d Cir. 1999)). "When an advertisement is false on its face or false by necessary implication, a court may grant relief 'without reference to the advertisement's actual impact on the buying public' because consumer confusion is presumed." *Playtex Prods., LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *4 (S.D.N.Y. Mar. 29, 2016) (quoting *Time Warner Cable, Inc. v. DirectTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)).

Here, Defendants deceive internet users by featuring Google's Marks on their spoofed websites, falsely marketing their scam as bearing Google's approval or involvement. Compl. ¶¶ 101–04; Google Decl. ¶¶ 34–35, 37. That fraudulent marketing scheme easily satisfies the elements of false advertising. The representations are literally false because the spoofed websites are not from or endorsed by Google, and the unauthorized use of the Google Marks in connection with the fraudulent schemes violates Google's terms of service. *See* Compl. ¶¶ 105–07; Google Decl. ¶¶ 29–36. And the representations are material because they are critical to the success of the phishing operation. The only reason Defendants' schemes are successful is because their websites

appear to be real—they bear the marks of trusted institutions and brands like Google and YouTube. *See* Compl. ¶¶ 102–03; Google Decl. ¶ 37. The messages using Google's Marks are placed in interstate commerce on the internet. *See* Compl. ¶ 100; Google Decl. ¶¶ 32, 40–41. And the messages have caused injury to Google by damaging its hard-earned goodwill, tarnishing its Marks by association with fraud, and forcing it to spend substantial resources to combat the scams and protect its Marks. *See* Google Decl. ¶¶ 42–43. Defendants have thus violated the Lanham Act in multiple ways, many times over. For all these reasons, Google's Lanham Act claims are likely to succeed on the merits.

### (ii)     Google Is Likely to Succeed on Its RICO Claim.

Google is likely to prevail on its RICO claim. To prove a RICO claim, a plaintiff must establish that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (cleaned up). The defendant also must have engaged in "interstate or foreign commerce" in carrying out these acts. *See Hinterberger v. Catholic Health Sys., Inc.*, 536 F. App'x 14, 16 (2d Cir. 2013). And the defendant must have caused "an injury to business or property." *DeFalco*, 244 F.3d at 305. A private plaintiff is entitled to equitable relief when it demonstrates injury under RICO. *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 95 (2d Cir. 2024).

Google satisfies each of the required elements of a RICO claim. The Darcula Enterprise is a digital incarnation of organized crime, and it carries out its illicit activities not only in New York but across the United States and around the world. Defendants share a common purpose of defrauding victims into disclosing sensitive personal information, including financial account details, and stealing their money. United by the Magic Cat software and social media infrastructure, the Enterprise quickly and easily coordinates sophisticated phishing schemes. Those schemes tarnish Google's reputation, hurt Google's customers, and require Google to incur costs

investigating the Enterprise's racketeering activity, injuring Google's business or property as a direct result of the Enterprise's operations.

1. **Conduct.** To satisfy the conduct element, a plaintiff must establish that the defendants had "some part in directing [the enterprise's] affairs." *DeFalco*, 244 F.3d at 309 (cleaned up). This standard is "not limited to those with primary responsibility," nor is it limited to those "with a formal position in the enterprise." *Id.* (cleaned up). Here, each Defendant had at least "some part" in the Darcula Enterprise. *See id.*; *see also* Compl. ¶¶ 47–71; Naxo Decl. ¶¶ 18–20. Members of the Enterprise all take part in directing aspects of its activities: some develop the PhaaS software, architecture, and user interface; others create and manage an online community that recruits new members of the Enterprise and facilitates constant communication; others supply lists of potential victims' contact information; others specialize in strategies for sending out SMS messages; and yet others steal more of a victim's information and money after the Enterprise acquires phished credentials. *See id.* The Enterprise works together to implement its schemes; none of the schemes can generate revenue without the Enterprise members' cooperation. *See* Compl. ¶¶ 71–72; Naxo Decl. ¶ 18.

2. **Enterprise.** To show that the defendants participated in and operated as an enterprise, a plaintiff must establish (1) "a common purpose of engaging in a course of conduct"; (2) "an ongoing organization, formal or informal"; and (3) "evidence that the various associates function as a continuing unit." *DeFalco*, 244 F.3d at 307 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The Enterprise members' common purpose is clear: to enrich themselves by executing a wide variety of coordinated phishing schemes. Compl. ¶¶ 114–16; Naxo Decl. ¶ 107. Defendants play interdependent roles, with the Enterprise relying "on the actions of each of the Defendants to execute its fraudulent scheme." *1567 56th St., LLC v. Spitzer*, 774 F.

Supp. 3d 476, 490 (E.D.N.Y. 2025). Using the Magic Cat software, Defendants can choose from hundreds of fake website templates or leverage AI technology (courtesy of the Developer Group) to set up fraudulent phishing websites that are designed to appear identical to legitimate websites. Compl. ¶¶ 48–53; Naxo Decl. ¶ 17. They can then turn to the Enterprise's Telegram channels and other communications forums (operated by the Administrative Group) to coordinate phishing activities across the Data Broker, Spammer, and Theft Groups. Compl. ¶¶ 54–61; Naxo Decl. ¶¶ 18, 20. Through the Magic Cat software and the accompanying online community, Defendants "pool[] their resources, knowledge, skills, and labor to achieve through th[at] enterprise efficiencies . . . that none of them could have achieved individually." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 883 (10th Cir. 2017). Defendants thus function as a unit. *See United States v. Errico*, 635 F.2d 152, 156 (2d Cir. 1980) (affirming finding of RICO enterprise where a "network of jockeys and bettors" "came together" to "profit from the illegal fixing of races"). Google has provided strong evidence establishing that Defendants are a group of persons associated together, as a continuing unit, for the common purpose of carrying out criminal activities.

 **3.** **Pattern.** To show a "pattern" of racketeering activity under RICO, a plaintiff must establish "at least two acts of racketeering activity, one of which occurred [after 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." *DeFalco*, 244 F.3d at 306 (quoting 18 U.S.C. §1961(5)). The racketeering activity must exhibit "continuity" over time. *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995). Continuity is especially easy to demonstrate where the aims of the enterprise are inherently unlawful. *Id.* Google has presented numerous examples of the Enterprise's criminal conduct that clearly form a "pattern" within the meaning of the statute. Compl. ¶¶ 74–89, 94–95; Naxo Decl. ¶¶ 22–26. Indeed,

the Enterprise has stolen credit card information from tens of thousands of individuals in the United States between October 2023 and June 2024 alone through its fraudulent text messages directing those victims to its spoofed phishing websites. Compl. ¶ 91; Naxo Decl. ¶ 20. And there can be no doubt that the aims of the Darcula Enterprise—to perpetrate phishing schemes—are inherently unlawful.

4.     **Predicate Acts.** To show that a defendant engaged in racketeering activity, a plaintiff must establish that the defendant committed one or more of the predicate acts enumerated in 18 U.S.C. § 1961(1). *See DeFalco*, 244 F.3d at 306. The predicate acts include violations of the federal wire fraud statute. 18 U.S.C. § 1343.

The Darcula Enterprise committed wire fraud by "transmitt[ing], by means of wire … communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing [fraudulent] scheme[s]," 18 U.S.C. § 1343, each time its members sent text messages to trick individuals in the United States into unknowingly submitting sensitive personal or financial information through misrepresentation and deception to steal those victims' money, *see Bascunan v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) ("There are three 'essential elements' to mail or wire fraud: '(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'" (citation and emphasis omitted)). In a seven-month period in 2023 and 2024, more than 500,000 individuals in the United States clicked on the links in Defendants' fraudulent text messages, and nearly 40,000 of these individuals went on to unwittingly provide their credit card information to the Enterprise in the fraudulent websites the text messages lured them to. Compl. ¶ 91; Naxo Decl. ¶ 20. And between September and December 2025, over 5,000 Google Messages users reported to Google fraudulent messages they received from the Darcula Enterprise to perpetrate phishing schemes to steal money

from these targets. Compl. ¶ 124; Google Decl. ¶ 40. Defendants have committed wire fraud many times over.

5.    **Injury to Google's Business and Property.** Defendants' RICO violations have directly caused Google injury to its business and property. "A plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged. Section 1964(c) requires nothing more." *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025); *see also id.* (construing "injure" in Section 1964(c) to have its "ordinary meaning," which encompasses "damage of or to ... reputation" (cleaned up)). The injury to Google's business is an inherent component—and is the direct result—of the Darcula Enterprise's schemes. Those scams dupe their victims into turning over their sensitive information by mimicking YouTube and other trusted brands, government agencies, and financial institutions, relying on Google Marks to prey on consumer trust. Google must respond to remediate the business impact of the Darcula Enterprise's schemes. It has been forced to spend time (over 150 hours) and money investigating the schemes and pursuing other mitigation efforts. Compl. ¶ 108; Google Decl. ¶ 43. Defendants' RICO violations have injured Google's business or property.

(iii)    **Google Is Also Likely to Succeed on Its RICO Conspiracy Claim.**

In addition to establishing a substantive RICO violation, Google can demonstrate that the Enterprise engaged in a RICO conspiracy. To establish that claim, Google need only prove that the Enterprise "conspire[d] to violate" the provisions of 18 U.S.C. § 1962(d). The overlapping links among the Defendants—including the use of the Magic Cat software, the chats from the Telegram group, and the methods used to deploy sophisticated and widespread schemes—demonstrate that the Enterprise formed an agreement to undertake the acts described above as part of a common scheme and conspiracy. Compl. ¶¶ 34–46, 54–61, 71, 74–89, 130; Naxo Decl. ¶¶ 18–

20. Because they agreed to form and operate the Enterprise and to commit the numerous predicate acts of fraud and related activity that make up the criminal activities, Defendants are liable under 18 U.S.C. § 1962(c).

### (iv) Google Is Likely to Succeed on its CFAA Claims.

Congress enacted the CFAA to combat computer-related crimes. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 525 (2d Cir. 2015). The Darcula Enterprise's phishing schemes involve "precisely the type of activity that the CFAA is designed to prevent." *See, e.g.*, Preliminary Injunction Order, *Google LLC v. Does 1–25*, No. 1:25-cv-09421 (S.D.N.Y. Dec. 1, 2025), ECF No. 27 at ¶ 11 (finding CFAA liability for a similar phishing scheme). Courts routinely grant injunctive relief under the CFAA. *See, e.g.*, *id.* at *4. The Enterprise has violated and is continuing to violate the CFAA.

The evidence shows that the Defendants have "knowingly and with intent to defraud traffic[ked] in … password[s] or similar information," which can be used to gain unauthorized access to computer systems, by transferring and selling victims' stolen financial information and credentials through Telegram channels and other online forums. 18 U.S.C. § 1030(a)(6); *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1297 (S.D. Fla. 2017) (plaintiff stated claim under § 1030(a)(6) where trafficking occurred over the internet and a telecommunications network). To "traffic" a password means to "transfer" it. 18 U.S.C. § 1029(e)(5) ("[T]raffic means transfer, or otherwise dispose of, to another, or obtain control of with intent to transfer or dispose of" the password."). After procuring phished credentials (including account authorization codes) by impersonating other entities, the Enterprise transfers or sells those credentials to other members of the Enterprise and other cybercriminals. Compl. ¶¶ 77, 89, 91; Naxo Decl. ¶¶ 6, 19.

And Google has shown that Defendants' CFAA violations have caused losses exceeding $5,000 to multiple persons within the course of a year, including the costs Google incurred investigating and responding to Defendants' widespread phishing schemes, Google Decl. ¶ 43, giving rise to Google's civil right of action "to obtain compensatory damages and injunctive relief or other equitable relief," 18 U.S.C. § 1030(g); *id.* § 1030(c)(4)(A)(i)(I); *see also Saunders Ventures, Inc. v. Salem*, 797 F. App'x 568, 572–73 (2d Cir. 2019); *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 387–88 (S.D.N.Y. 2010). Google is therefore likely to succeed on the merits of its CFAA claim.

### C. The Balance of Equities Decidedly Favors a Temporary Restraining Order.

The equities also favor a TRO. The Enterprise commits crimes, defrauds the public, and injures Google. There is no conceivable reason why the Enterprise should be permitted to continue its illegal activities. *See, e.g.*, *Suber v. VVP Servs.*, 2021 WL 1101235, at *7 (S.D.N.Y. Mar. 23, 2021) (balance of hardships supported court's grant of an *ex parte* injunctive relief where the Enterprise did not "have any right to use the profits of a fraudulent enterprise … to continue supporting their unlawful activities or for personal uses"); *FTC v. Verity Int'l, Ltd.*, 2000 WL 1805688, at *1 (S.D.N.Y. Dec. 8, 2000) (balance of equities weighs in favor of a TRO where the Enterprise's practices likely violate a federal statute). It is "axiomatic that an infringer . . . cannot complain about the loss of ability" to continue infringing, *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 404 (E.D.N.Y. 2021) (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012)), and Defendants' misconduct poses "grave harm . . . to [Google's] reputation and brand in the absence of an injunction." *Id.*[4]

---

[4] *See, e.g.*, *Google LLC*, No. 1:25-cv-09421, ECF No. 18 at ¶¶ 6–7; *Microsoft Corp. v. Does 1–2*, 2024 WL 1708328, at *11 (E.D. Va. Jan. 10, 2024) ("Defendants would not suffer any hardship

### D. The Public Interest Favors a Temporary Restraining Order.

Finally, a TRO would serve the public interest. The Darcula Enterprise has defrauded over a million victims, while using their ill-gotten funds to support further criminal schemes. *See* Compl. ¶¶ 1, 67–70; Naxo Decl. ¶¶ 20, 102–04. With each day, Defendants create new phishing websites to deceive more victims. The public interest is served by enforcing statutes designed to protect the public—such as RICO, the Lanham Act, and the CFAA—and thwarting criminal activity with no legitimate justification whatsoever. *See, e.g.*, *CME Grp. Inc.*, 2019 WL 13252902, at *3 (public interest is served by enforcing Lanham Act against phishing operation); *Microsoft Corp.*, 2022 WL 18359421, at *5 (similar for CFAA).

## II. The Temporary Restraining Order Must Be *Ex Parte*.

Rule 65 authorizes courts to enter a TRO *ex parte* when the moving party sets forth facts that show an immediate and irreparable injury and why notice should not be required. Fed. R. Civ. P. 65(b)(l). Under this rule, an order may be issued without prior oral or written notice if (1) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant" before the adverse party can be heard and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Id.* A TRO "may be ordered on an *ex parte* basis under subdivision (b) if the applicant makes a strong showing of the reasons why notice to the Defendants is likely to defeat effective relief." Fed. R. Civ. P. 65 committee notes to 2001 amendment. As such, even where specific notice could have been given to the adverse party, *ex parte* orders are proper when notice "appears to serve only to render fruitless further prosecution of the action." *In re Vuitton et*

---

because an injunction would only require them to cease engaging in illegal activities."), *R&R adopted*, 2024 WL 1708323 (E.D. Va. Jan. 30, 2024); *Microsoft Corp.*, 2022 WL 18359421, at *5 (same with regard to similar phishing operation).

*Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) (per curiam); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974).

In any event, Google does not presently know Defendants' true identities because they routinely deploy aliases and false identities in connection with their cybercrime; consequently, it cannot provide them with written or oral notice. Courts routinely grant *ex parte* relief in these circumstances. *See*, *e.g.*, *Google LLC*, No. 1:25-cv-09421, No. ECF 18 (granting *ex parte* TRO against nearly identical phishing scheme); *Mirashi v. Doe*, 2025 WL 783353, at *5 (D.N.J. Mar. 12, 2025) (granting ex parte TRO against phishing scheme where "Plaintiff's attorney has certified that neither he nor Plaintiff knows the identi[t]y of the Hacker" and "alerting the Hacker … would likely prompt the Hacker to take more 'extreme measures' to 'conceal and dissipate the stolen Bitcoin'"); *Sapient Corp. v. Does 1–50*, 2018 WL 8221301, at *2 (N.D. Cal. Mar. 27, 2018) (in action to enjoin phishing scheme, "SapientRazorfish's request for ex parte relief is not the result of any lack of diligence on SapientRazorfish's part, but instead based on the nature of Defendants' unlawful conduct"). *Ex parte* relief is also routinely granted where, as here, defendants are engaged in technically sophisticated cybercrimes such as those the Darcula Enterprise perpetrates and are "likely to delete or to relocate" their harmful internet infrastructure, "destr[oy] or conceal[] . . . other discoverable evidence" of misconduct, and "warn their associates engaged in such activities" if given "advance notice of th[e] action." *E.g.*, *Sophos Ltd. v. Does 1–2*, 2020 WL 4722425, at *2 (E.D. Va. May 1, 2020); *see also Filipova v. Gezhong (7–21 Delivery)*, 2025 WL 2831148, at *3 (S.D.N.Y. Oct. 6, 2025) (granting *ex parte* relief where "Defendants may easily and quickly transfer or modify e-commerce store registration data and content, . . . thereby thwarting Plaintiff's ability to obtain meaningful relief"); *Google LLC v. Starovikov, et al.*, No. 1:21-cv-10260

(S.D.N.Y. Dec. 27, 2021), ECF No. 8 (*Ex Parte* Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction).

This case presents the same danger and requires immediate relief. The Enterprise's technological sophistication and ability to conceal operations pose a significant risk (if not certainty) that they will attempt to relocate and hide evidence of their phishing operations if Google is required to find and give the Enterprise advance notice of the precise relief it seeks. *See* Google Decl. ¶ 47. To ensure that the *ex parte* relief is strictly limited to "serving [its] underlying purpose" and no more, *Granny Goose Foods Inc.*, 415 U.S. at 439, if the proposed order is granted, Google will undertake efforts to locate and provide actual notice to Defendants of the TRO and preliminary injunction hearing, and will attempt to effect service of the relevant papers immediately upon effectuation of the injunctive relief in the proposed order, and in no event fewer than five days before the preliminary injunction hearing (or such time as the Court may order).

There is also good cause for the Court to set a hearing for Defendants to show cause in early January, with the TRO remaining in effect until that hearing. Google will effectuate the disruption over the holidays and expects that the requisite coordination and action from at least 15 registrars may take longer than usual. A court may extend a TRO beyond 14 days if it finds that there is good cause to do so. Fed. R. Civ. P. 65 (b)(2). Good cause exists "if the circumstances that supported the initial grant of the temporary restraining order" have not changed. *FTC v. Automators LLC*, 2023 U.S. Dist. LEXIS 150791, at *3 (S.D. Cal. Aug. 25, 2023) (collecting cases). Just this year, this Court extended a TRO to afford additional time to complete technical disruption plans. *See, e.g.*, Order Extending Temporary Restraining Order, *Google LLC v. Does 1–25*, No. 1:25-cv-04503, ECF No. 17 (S.D.N.Y. July 1, 2025). It should grant a brief extension of the TRO here as well.

**III.      The Court Should Authorize Google to Serve Process by Alternative Means.**

Google also requests permission to serve Defendants, who are believed to reside in China, by alternative means under Federal Rule of Civil Procedure 4(f)(3). Compl. ¶¶ 14–15; Google Decl. ¶ 28. Google requests authorization to serve Defendants through (1) website publication, and (2) email using any information Google receives through disruption efforts and from web-hosting companies provided in connection with domain names used in the Darcula phishing operation and/or any email addresses identified through Google's investigation.

Courts have long authorized alternative service through a variety of methods, "including publication, ordinary mail, … and most recently, email." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002). "It is well-settled that service by email on foreign defendants meets this standard in an appropriate case." *Elsevier, Inc. v. Siew Yee Chew*, 287 F. Supp. 3d 374, 379 (S.D.N.Y. 2018). Here, service through website publication and electronic messages is likely to be the most accurate and viable means of notice and service for these foreign cybercriminal Defendants. Other courts have routinely authorized service by website publication and/or email or electronic messaging in similar circumstances. *See*, *e.g.*, *Google LLC*, No. 1:25-cv-09421, ECF No. 18 (granting alternative service by website publication and email for foreign defendants involved in nearly identical phishing scheme); *Sapient Corp.*, 2018 WL 8221301, at *1; *Microsoft Corp. v. Does 1–18*, 2014 WL 1338677, at *3 (E.D. Va. April 2, 2014). And "combin[ing]" multiple means of alternative service reinforces its permissibility and effectiveness. *Juicero, Inc. v. Itaste Co.*, 2017 WL 3996196, at *3 (N.D. Cal. June 5, 2017); *Marvici v. Roche Facilities Maint. LLC*, 2021 WL 5323748, at *4 (S.D.N.Y. Oct. 6, 2021). Google therefore respectfully requests that the Court authorize alternative service under Rule 4(f)(3) using the proposed methods.

**IV.    The All Writs Act Authorizes the Court to Direct Cooperation by Third Parties.**

The Enterprise uses domains provided by third-party registrars for the fake websites created to perpetrate its fraud. Google's proposed order, if entered by the Court, would direct these third-party registrars to take down and suspend this cyber infrastructure used by the Enterprise, thereby disrupting its schemes, and to preserve all evidence about Defendants and their websites. Google Decl. ¶¶ 47–48. This relief would include the disruption of any domains that the Enterprise may use in the future to perpetrate the phishing operation that are currently unknown to Google or that have not yet been created or deployed. The All Writs Act provides that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). This language empowers courts to issue orders to non-parties, and specifically, in "appropriate circumstances," to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *Makekau v. Hawaii*, 943 F.3d 1200, 1205 (9th Cir. 2019) (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977)). Notably, this jurisdiction may "encompass[] even those who have not taken any affirmative action to hinder justice." *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 413–14 (2d Cir. 2002) (cleaned up). This "grant of authority to enjoin and bind non-parties to an action" when "needed to preserve the court's ability to … enforce its decision" is "[a]n important feature of the All Writs Act." *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 338 (2d Cir. 1985).

To determine whether the writ requested is "necessary or appropriate" within the meaning of the Act, courts consider whether: (1) the writ "unreasonabl[y] burdens" the third party at issue; (2) the writ is "necessary" or "essential to the fulfillment of the purpose" of a court order; and (3) the third party is "so far removed from the underlying controversy that its assistance could not

be permissibly compelled." *N.Y. Tel. Co.*, 434 U.S. at 172–78; *see also United Spinal Ass'n v. Bd. of Elections in City of N.Y.*, 2017 WL 8683672, at \*5 (S.D.N.Y. Oct. 11, 2017), *R&R adopted*, 2018 WL 1582231 (Mar. 27, 2018).

The narrowly tailored relief Google requests satisfies these requirements. *First*, requiring these companies to suspend, take down, or transfer the relevant infrastructure imposes minimal burdens. Just as a telephone company "regularly employs [pen register] devices without court order" for its own business purposes, *N.Y. Tel. Co.*, 434 U.S. at 174, domain registrars and web infrastructure companies routinely suspend, terminate, or transfer domain services in the ordinary course of business. *See Chegg, Inc. v. Doe*, 2023 WL 7392290, at \*10 (N.D. Cal. Nov. 7, 2023). *Second*, the writ requested is necessary to effectuate the proposed order, the purpose of which is to disrupt the Enterprise's operations and the criminal network that profits from its fraud. Just as the surveillance authorized in *New York Telephone* could not have been accomplished without the participation of the telephone company, the reasonable cooperation of the third-party registrars is required to halt the Enterprise's operation of its scam. *See In re U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire Commc'ns Over Tel. Facilities*, 616 F.2d 1122, 1129 (9th Cir. 1980). And *third*, the third parties that maintain this infrastructure are not "so far removed" from the underlying criminal activity that their assistance cannot reasonably be compelled. *See N.Y. Tel. Co.*, 434 U.S. at 174. They control the domains that enable the Enterprise to perpetrate its crimes.

Consistent with these principles, courts in this District and across the country have invoked the All Writs Act to grant relief similar to the relief requested here. *See*, *e.g.*, *Google LLC*, No. 1:25-cv-09421, No. ECF 18 at 11; *Google LLC v. Does 1–25*, No. 25-cv-04503 (S.D.N.Y. Sept. 18, 2025), ECF No. 18; *Starovikov*, 2021 WL 6754263, at \*1; *Microsoft Corp. v. Nady and Does 1–4*, No. 24-cv-02013 (E.D. Va. Nov. 13, 2024), ECF No. 16 at 10 (ordering domain

registries to ensure that defendant cannot use domains to engage in phishing); *Microsoft Corp. v. John Does 1–2*, No. 24-cv-02719 (D.D.C. Sept. 25, 2024), ECF No. 12 at 9 (similar).[5] To protect the public from the serious threat posed by the Magic Cat software and Darcula Enterprise, it is well within this Court's authority to order the takedown or transfer of the domains specified in **Appendix A** to the Naxo Declaration and to authorize Google to take down additional infrastructure in the event that Google identifies additional entities associated with or domains used in connection with the Magic Cat software.

## CONCLUSION

Google respectfully requests that this Court grant its motion for a TRO, a brief extension of that TRO until early January, and an order to show cause why a preliminary injunction should not issue. Google further requests that the Court permit notice of the preliminary injunction hearing and service of the complaint by alternative means.

---

[5] *Microsoft Corp. v. John Does 1–2*, No. 21-cv-00822 (E.D. Va. July 16, 2021), ECF No. 18 at 7 (ordering registries to take steps to prevent defendants from "accessing, modifying, transferring or using in any manner the domains"); *Microsoft Corp. v. Does 1–2,* No. 17-cv-01224 (E.D. Va. Oct. 27, 2017), ECF No. 26 at 8 (ordering registries to prevent transfer or modification of the domains).

Dated: December 17, 2025

Respectfully submitted,

_/s/ Laura Harris_

Laura Harris
**KING & SPALDING LLP**
1290 Avenue of the Americas, 14th Fl.
New York, NY 10104-0101
Tel: (212) 556-2100
Fax: (212) 556-2222
lharris@kslaw.com

Christine M. Carletta
Paul Weeks (*pro hac vice* to be submitted)
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Tel: (202) 737-0500
Fax: (202) 626-3737
ccarletta@kslaw.com
pweeks@kslaw.com

Sumon Dantiki (*pro hac vice* to be submitted)
**BAKER MACKENZIE LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006
Tel: (202) 452-7000
Fax: (202) 452-7074
sumon.dantiki@bakermckenzie.com

*Counsel for Plaintiff Google LLC*

## CERTIFICATE OF COMPLIANCE

I, Laura Harris, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c), that the foregoing Google LLC's Memorandum of Law in Support of Its Motion for an *Ex Parte* Temporary Restraining Order and Order to Show Cause was prepared using Microsoft Word and contains 8,730 words in accordance with Local Rule 7.1(c).